Argued January 7; affirmed March 10; rehearing denied
May 12, 1931

HOLT *v.* GUARANTY & LOAN CO. ET AL.

(296 P. 852)

*A. D. Leedy,* of Portland, for appellant.

*Isham N. Smith,* of Portland (Platt, Platt, Fales, Smith & Black, of Portland, on the brief), for respondent.

BROWN, J. The law of this state provides:

"A lien upon real or personal property, other than that of a judgment or decree, whether created by mortgage or otherwise, shall be foreclosed, and the property adjudged to be sold to satisfy the debt secured thereby by a suit": Oregon Code 1930, § 6-501.

In a case such as the one at issue, where ownership of pledged property is involved, the pledgor insolvent, and its managing officer absent from the state, it is peculiarly fitting that equity be invoked. For, as written by an eminent author:

"Jurisdiction exists over pledges of chattels or of things in action; the pledgee may enforce his security by a suit for a foreclosure and sale." 1 Pomeroy's Equity Jurisprudence (4th Ed.), § 164.

This holding is not affected by Senate Bill No. 117, "authorizing the sale by banks, trust companies and national banking associations of pledged collateral without judicial proceedings," enacted at the regular session of the Thirty-Sixth Legislative Assembly.

. As shown by our statement, defendant Bales filed a demurrer challenging the right of the plaintiff to maintain this foreclosure proceeding, and asserted that it was her duty as the pledgee of the collateral note to collect all sums as they became due thereon and apply the proceeds on the indebtedness until paid, "and return the balance to the pledgor." It will be noted that the pledgor was the insolvent defendant company, and that its president, the person who pledged the note, had long since departed from the confines of Oregon. However, following the overruling of the demurrer, this defendant answered over, and earnestly seeks affirmative relief at the hands of equity.

With relation to a suit or action to forclose a pledge, the authors of Corpus Juris say:

"Where the debt or obligation for which the property is pledged matures and is unpaid, or the pledgor otherwise defaults, the pledgee, regardless of any legal or summary remedy he may have, such as the right to sell without judicial process, may, at his election, file a bill in equity for the foreclosure of the pledge and a sale of the pledged property under an order of court; and in some jurisdictions this remedy is either expressly or impliedly authorized by statute. Resort to this remedy is particularly appropriate where there are conflicting claims as to the ownership and right of possession of the pledge. * * * The advantages of such a foreclosure are that it concludes the rights of all parties in interest, and prevents any recourse against the pledgee for violation of his duties to the pledgor or to third persons, and that it enables the pledgee to buy at the sale": 49 C. J., § 276, "Pledges."

Jones on Collateral Securities (3d Ed.), § 655, thus states the rights of the pledgee to recover on negotiable paper held as security:

"While the pledgee himself cannot, without express authority for this purpose, sell commercial paper

pledged as collateral, yet a court of equity may, at least under special circumstances, order a judicial sale of it. 'But the question of the right of a pledgee to come into court, and have a decree for a judicial sale of the pledge, is an entirely different question. This was always a well-recognized head of equitable jurisdiction, even where the pledgee or mortgagee had a right to sell the property. The sale being under the direction and control of the court, it has the power, as it is its duty, to see to it that the property shall not be sacrificed; and hence such a sale is not liable to the evils or abuses to which a sale by the party himself is subject. Just when and under what circumstances a court would or should order a sale of commercial paper or other collateral of similar character it is not necessary to consider. The right to do so, at least under special circumstances, is undoubted. * * *' Under special circumstances, a pledgee of negotiable paper may resort to a court of equity for a sale of the security, and may foreclose the pledge in the same manner and with like effect as if the transaction were a mortgage; and it is rather intimated that the same rule would apply in case of an ordinary pledge of such paper."

The testimony shows that the endorsement and delivery of the note by defendant Bales, the payee therein, to Guaranty and Loan Company, was made when Haradon was president of the loan company, and that, so far as third persons are concerned, it was made for the benefit of that company. It further shows that both the note and the mortgage securing it were thereafter assigned to this plaintiff.

■ It has long been the law of this jurisdiction that the lawful assignment of a negotiable promissory note payment of which is secured by a mortgage carries with it the mortgage: *Roberts v Sutherlin*, 4 Or. 219; *Barringer v. Loder*, 47 Or. 223 (81 P. 778); *Roth v. Troutdale Land Co.*, 83 Or. 500 (162 P. 1069); *U. S. Nat. Bank v. Holton*, 99 Or. 419 (195 P. 823). And, as Dr.

Andrew C. Smith aptly said when testifying on behalf of the plaintiff, "The Guaranty and Loan Company was Haradon, and Haradon was the * * * Loan Company."

The plaintiff testified that she was in the habit of transacting her own business, and that Haradon and her husband were brothers-in-law. She identified a cashier's check drawn on the West Coast Bank for $5,000 as her property, and testified that it represented $5,000 that she had received from her father's life insurance in 1899. She testified that for a while she had it invested in certain mortgages in Eastern Oregon, but withdrew it and placed it in a savings account with the West Coast Bank, and ultimately, being in search of a safe loan at a higher rate of interest than paid by the bank, withdrew it from the bank and loaned it to defendant Guaranty and Loan Company. She testified that, prior to making the loan to the defendant company, she was informed and believed that she was receiving triple security therefor; that Haradon, the president of the company, pointed out to her that her security would consist, first, of the Stewart note and mortgage; second, of the Bales endorsement thereof, and, third, the endorsement of Guaranty and Loan Company. She swore that when she accepted the Stewart note and mortgage as security for her loan, she knew nothing of any wrong or fraud in relation to the transaction; and that it was not until months afterwards that she learned that the loan company had transferred the instruments to her without right.

R. B. Baird, bookkeeper and treasurer of defendant Guaranty and Loan Company in October, 1926, testified that the company received and deposited to its credit in the Bank of California the proceeds of the check for $5,000. The testimony abundantly shows that the plain-

tiff loaned to the company the $5,000 that was received by it; and there is no testimony in the record that establishes, or tends to establish, that she had any information or knowledge as to the right of the Guaranty and Loan Company to pledge this note and mortgage as security for the loan. As stated by the bookkeeper and treasurer, the defendant company was engaged in the transaction of business during all of October, 1926, and did not become insolvent until early in 1927.

In *Harth v. Pollock,* 97 Or. 663 (193 P. 202), this court held that, where one of two persons must suffer by reason of the wrongful act of a third, the person whose act or omission made the injury possible should suffer. In rendering the opinion in that case Mr. Chief Justice McBRIDE said, among other things:

"We see no reason to differentiate this case from the multitude of other cases where persons have signed their names to blank notes or other negotiable paper, and left it in the hands of those who have made an unconscionable use of it. The fact that the instrument in this case was a deed instead of a negotiable instrument is a distinction without a logical difference. Neither, in the view of the writer of this opinion, is the intent with which the conveyance was left with Irwin of importance here. When a man leaves with a stranger an instrument executed and acknowledged with every legal formality necessary to indicate that he has made a conveyance of the property, but with the name of the grantee left blank, he ought, in common prudence, to contemplate the possibility that the depositee, if dishonest, might make an improper use of such instrument, and if such use is made of it he, and not the person whom he has put it in the power of his agent to defraud, ought to suffer the loss."

He then quoted from the case of *Guthrie v. Field,* 85 Kan. 58 (116 P. 217, 37 L. R. A. (N. S.) 326), as follows:

"One who arms another with such an uncontrollable power must know that, if this chosen agent shall prove

dishonest, that is likely to happen which, in fact, happened here; and, if such result follows, it must be regarded as the consequence of his own imprudence.''

■ The contentions of defendant Bales are not consistent each with the other. He asserts, in effect, that it was the duty of the plaintiff to collect the sums of money on the note pledged as security as they fell due, apply the proceeds to the indebtedness until paid, and return the balance to the pledgor. A strange contention, in view of defendant's averments and prayer. For he says in his answer that the plaintiff has neither right, title or interest in the Stewart note and mortgage, and prays for a decree dismissing the complaint as to himself, and that he be decreed the owner and entitled to the immediate possession of that note and mortgage. These conflicting contentions, together with the other special circumstances set forth in our statement, illustrate the requirement for an equitable proceeding to protect the rights of all interested parties. The testimony shows that the plaintiff was a holder in due course of the Stewart note, as defined by Oregon Code 1930, § 57-409. Nor was her title defective as such a title is defined by section 57-405 thereof. For an elaborate discussion of these sections, see *Bank of California v. Portland Hide and Wool Co.*, 131 Or. 123 (282 P. 99), where Mr. Justice BEAN, speaking for the court, wrote:

''The strictness of the general equity doctrine of constructive notice is not applied to a purchaser for value of negotiable instruments before maturity. * * * Only knowledge of such facts as would make his purchase an act of bad faith is sufficient to impeach his title as a holder in due course.''

■ Defendant Bales contends that, at the time the plaintiff took the note in question, she had actual notice of the defect in the title thereto, for the reason that

practically two years' interest was due on the note at the time of its assignment, and that the note contained the provision that the interest was "to be paid annually and if not so paid the whole sum of both principal and interest to become immediately due and collectible" at the option of the holder thereof. We cannot agree with the defendant. There is no testimony in the record to indicate that any holder of the note ever exercised his option to declare it due and payable. A leading case touching directly upon this issue is *Merchants' Nat. Bank v. Smith,* 110 S. C. 458 (96 S. E. 690, 11 A. L. R. 1274), where the court held that overdue interest on an unmatured note does not affect the good faith of one purchasing it. In a valuable annotation to this case appearing on page 1278 of 11 A. L. R., we find the following observation:

"The courts seem to agree that the mere fact that interest is overdue on the note does not mature the note, and therefore a purchaser is not subject to equities on the ground that he has purchased overdue paper."

Among the cases supporting the doctrine just noted is *U. S. National Bank v. Floss,* 38 Or. 68 (62 P. 751, 84 Am. St. Rep. 752).

This case is affirmed, without costs to either party.

BEAN, C. J., BELT and CAMPBELL, JJ., concur.